UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JING ZHANG and WOMEN'S RIGHTS IN
CHINA,

                   Plaintiffs,

      - against -

JENZABAR, INC., THE JENZABAR
FOUNDATION, INC., ALL GIRLS ALLOWED,
INC., and LING CHAI,

                  Defendants.
--------------------------------------------------------X
--------------------------------------------------------X

ALL GIRLS ALLOWED, INC.,

                  Counter-claimant,

      - against -


JING ZHANG and WOMEN'S RIGHTS IN
CHINA,

                  Counterclaim Defendants.

--------------------------------------------------------X

**MEMORANDUM AND ORDER**
12-CV-2988 (RRM) (RER)

ROSLYNN R. MAUSKOPF, United States District Judge.

      This case arises out of the alleged employment discrimination of Jing Zhang and the

discrimination-by-association of the organization she founded, Women's Rights in China, by the

defendants.  Zhang claims that she was fired for failing to change her religious practices to

comport with those mandated by Ling Chai, the founder of All Girls Allowed ("AGA"), The

Jenzabar Foundation ("Foundation"), and Jenzabar, Inc. ("Jenzabar").  Women's Rights in China

("WRIC") alleges that Jenzabar and the Foundation ended their ongoing financial support of

WRIC immediately upon firing Zhang.  Zhang and the defendants cross-moved for summary

judgment, and the motions focus on two disputed issues – whether AGA is a religious organization entitled to a statutory exemption from religious discrimination, and whether Jenzabar is liable for discrimination as Zhang's employer.  Because this Court finds that material disputes of fact remain with respect to these and other issues relating to summary judgment, the parties' cross-motions are denied in their entirety.

## A.  Background[1]

Jing Zhang was born in 1963, and after becoming involved in efforts to promote democracy in China, she immigrated to the United States in 1997.  In 2007, she established Women's Rights in China ("WRIC"), a non-profit organization focused on protecting the rights of women and children in China.

Ling Chai was born in China in 1966, and became involved in pro-democracy demonstrations as a graduate student.  She immigrated to the United States in 1990, and eight years later she founded Jenzabar, a software management company in which she maintains an ownership interest and for which she serves as President and Chief Operating Officer.  Chai's husband, Robert Maginn, is the Chief Executive Officer of Jenzabar, and Chai and Maginn are two of the four members of the Board of Directors for Jenzabar, and each has an ownership interest in the company.  In 2007, Chai created the Foundation, a public charity devoted to funding community service-based student activities and supporting other charitable organizations involved in education and social welfare.  Jenzabar is the sole member of the Foundation, and Chai and Maginn are the sole members of the Board of the Foundation.  (Doc. No. 59 at ¶¶ 36–37, citing Ex. 9–11.)  On December 4, 2009, Chai "gave [her] life to Jesus Christ," (Ex. E (Doc. No. 66–5) at 1302), and she was baptized on April 4, 2010.  (*Id.* at 131.)

---

[1] Other than the noted disputes, the following section contains undisputed facts culled from the parties' 56.1 statements.

Zhang and Chai met after Zhang spoke about WRIC's work at a conference Chai attended on June 4, 2009. In September, Zhang asked Chai to serve as president of WRIC, but Chai declined that offer. On November 10, Zhang testified in front of Congress about China's one-child policy, and Chai served as her interpreter. (Doc. No. 59 at ¶ 75.) It was this hearing that motivated Chai to found All Girls Allowed ("AGA") to combat this policy. (Doc. No. 59 at ¶ 39.)

In April or May of 2010, Chai and Zhang discussed the formation of AGA and the possibility of working together. (Doc. No. 68 at ¶32.)[2] On May 28, 2010, Chai emailed Jenzabar's HR department, copying Zhang, and asked them to prepare an offer letter for Zhang.[3] The subject line of that email stated "Offer letter to Jing Zhang for All Girls Allowed." In substance, the email states "I would like to make an offer letter to Ms. Jing Zhang, who is based out of NYC, to be the Executive Director on China and Oversea community." (Ex. 17 (Doc. No. 58-19)) (the "May 28 Email")

AGA was officially launched on June 1, 2010, at an event both Chai and Zhang attended. The materials distributed at this event (the "Information Packet") are disputed.[4] The mission

---

[2] Chai claims that she told Zhang during this conversation that AGA would not be a secular organization like WRIC, but rather, a religious organization that would rely on the power of God to defeat the evils posed by gendercide and China's One-Child Policy. (Doc. No. 68 at ¶32, citing Ex. E at 139-40). Chai also claims that it was during this telephone conversation that Zhang informed Chai that she had read Chai's "testimony" about Chai's conversation to Christianity. (Doc. No. 68 at ¶33, citing Ex. E at 148) Zhang claims that Chai did *not* inform her that AGA would be a religious organization, and has no recollection of mentioning Chai's conversion or her "testimony." (Ex. B (Doc. No. 71–2) at 131, 201-02, 237).

[3] The email is sent from Ling.Chai@jenzabar.net to Pat.Bennett@jenzabar.net, Christine.Scanlon@jenzabar.net, JBeahm@thejenzabarfoundation.org, and it copies jingzhang63@gmail.com. Under Chai's signature line, the email contains address information for The Jenzabar Foundation, and it contains the phrase "Bringing God's Love to China." (Ex. I (Doc. No. 66-9).)

[4] The defendants claim that the Information Packet was distributed and included AGA's mission statement – that AGA seeks to achieve its objectives through "education, persuasion, prayer and legal defense" and that AGA was motivated by a desire to "transform lives through God's love and amazing grace." (Ex. J (Doc. No. 66-10).) Zhang cites a lack of evidence that the Information Packet (Exhibit J) was distributed to anyone, and also disputes that Exhibit J reflects AGA's actual mission statement, noting that other versions of AGA's mission statement, including

3

statement supposedly contained in the Information Packet explains that AGA seeks to end infanticide "through education, persuasion, prayer and legal defense and by partnership with grassroots organizations in China and around the world." (Ex. J at 2.) It continues that its methods will include:

- Reaching out to parents to urge them not to commit "gendercide" by practicing selective abortion or killing their female newborns;
- Supporting abandoned children, the vast majority of whom are girls, by raising funds for orphanages;
- Reuniting trafficked children with their families; and
- Educating the public, including the policy-makers, about the brutal and cruel methods used to enforce the 1978 one-child policy, praying for their change of hearts and minds, and providing legal defense to mothers who are facing or have undergone forced abortions or forced sterilization.

(*Id.*) The mission statement closes by stating that "AGA is motivated by a desire to restore equality between men and women, to bring back joy, peace and dignity to motherhood and to transform lives through God's love and amazing grace." (*Id.*) The remainder of the Information Packet contains what appear to be political advocacy materials; a piece of U.S. legislation relevant to "victims of China's family planning policy"; and lists of "important figures in the formulation & implementation of China's one-child family planning policy," which includes politicians, strategists, policy formulators, and former national leaders, along with short descriptions of their roles. (*Id.*) At the top of the list, it reads "Please pray for them by name to come to light and free the women and children." (*Id.*) Chai testified that she founded AGA intending it to be a religious organization, (Ex. E (Doc. No. 66–5) at 82–83), and that she informed Zhang after the launch that those who worked with AGA needed to believe in Jesus Christ. (Ex. E at 143–44.) Zhang denies that any such communication happened. (Doc. No. 68 at ¶ 57.)

---

those incorporated in AGA's foundational documents and posted on AGA's website, do not describe AGA as having any religious connection or motivation. (Doc. No. 68 at ¶42.)

It is undisputed that Jenzabar and the Foundation provided the majority of AGA's initial financial support, and AGA operated primarily through those donations.[5]  (Doc. No. 68 at ¶47; Doc. No. 59 at ¶53.)  AGA's Boston offices are on the same floor in the same building as Jenzabar's headquarters.  (Ex. 8 at 41, 44.)  Until June of 2012, Chai was the sole officer and director of AGA.  (Doc. No. 59 at ¶¶ 58, 146 citing Ex. 8 at 89–91.)  Jenzabar also paid all employees working on AGA-related business, at least until April or May of 2012.[6]  (Doc. No. 59 at ¶ 57; Ex 8 (Lee Dep.) (Doc. No. 58–9) at 37.)  Employees working on AGA-related work could elect to enroll in Jenzabar's employee benefit programs, and worked through Jenzabar's HR department, as AGA did not have any contracts with benefit providers, its own group insurance enrollment form, life beneficiary form, long-term disability enrollment form, or telecommuting agreement.  (Doc. No. 59 at ¶¶ 63–67.)  AGA also did not have its own employee handbook or HR department.  (*Id* at ¶¶ 66–67.)  Jenzabar's general counsel drafted AGA's 501(c)(3) application submitted in April of 2011, and Jenzabar paid the filing fee for the application.  (*Id.* at ¶¶ 70–71.)

AGA was incorporated on July 1, 2010 and its Articles of Organization include the following statement:

> The purpose of the organization is to engage in the following business activities: All Girls Allowed, Inc. (the "Corporation") is organized and shall be operated exclusively for charitable, educational, literary or scientific purposes . . . In furtherance of such purposes, the corporation shall be authorized to promote, support and engage in activities carried on for charitable, educational, literary or scientific purposes, by the direct conduct of

---

[5] The parties dispute various details about the Jenzabar-AGA arrangement.  Zhang claims that AGA used Jenzabar's physical facilities, including its phones, copiers, computers, and information technology support.  (Ex. 8 (Doc. No. 58–9) at 44, 48).  The defendants claim that the office space, phones, and computers used by AGA were donated to AGA by Jenzabar.  (Ex. E at 174–75.)

[6] Brian Lee, the executive director of AGA, received an offer letter from Jenzabar, Jenzabar's employment handbook, employee benefits through Jenzabar, and a paycheck from Jenzabar until at least April of 2012. (Ex. 8 at 38–40, 48–49.)  Jenzabar paid Zhang's salary and provided her with employee benefits throughout her employment. (Doc. No. 59 at ¶¶ 106–07.)

such activities, and by making grants to other organizations engaged in such activities.  Those activities may include, but are not limited to, human rights relief work; raising support and awareness of the plight of oppressed women, girls and orphans; and carrying on any other charitable activity permitted to be carried on by a non-profit corporation exempt from income tax under section 501(c)(3) of the internal revenue code.  (Ex. 12 (Doc. No. 58–13).)

AGA's bylaws contain a substantively identical statement of the organization's "purpose and mission."  (Ex. 10 (Doc. No. 58–11) at AGA 0071.)  The defendants concede that the language in the Bylaws and the Articles of Organization does not describe AGA as a religious organization, but argue that AGA's human rights work, as referenced within both, "at all times was motivated and guided by the teachings of Jesus Christ."  (Doc. No. 59 at ¶¶ 46, 48.)[7]

On June 10, 2010, Zhang received a letter from Jenzabar's HR department (the "June 10th Agreement") offering her "the temporary position of Director of China and Overseas Communities."[8]  (Ex. M (Doc. No. 66–13).)  The first paragraph of the document states: "Jenzabar is delighted to offer you the temporary position of Director of China and Overseas Communities reporting to Ling Chai.  We believe that by virtue of your talents and dedication, you can be instrumental in assisting Jenzabar to achieve its business plan."  (*Id.*)  It continued that her start date was June 1, 2010, that her base salary was $28,800, and that she would be paid "in accordance with Jenzabar's standard payroll practices and subject to applicable withholdings and taxes.  As a temporary employee, you are not eligible to participate in Jenzabar's benefits or

---

[7] However, the evidence cited for this principle does not clearly support it.  The cited portion of Chai's deposition only describes Chai's understanding of Zhang's religious beliefs and how those meshed with Chai's vision of AGA as a religious organization, as well as Chai's (disputed) memory of conveying that vision to Zhang in June of 2010. (Ex. E at 82–83, 139.)  In a completely different context, discussing the employment proposal sent to Zhang in March of 2012, Lee testified that "we felt it was necessary to put in clarifying statements . . . that [Zhang] still held these universally Catholic and Christian beliefs that we also held at All Girls Allowed, that had a strong basis for the work that we did."  (Ex. F at 291.)  The last piece of support offered for this characterization is the Information Packet arguably distributed at AGA's launch, which explains that AGA seeks to end infanticide "through education, persuasion, prayer and legal defense and by partnership with grassroots organizations in China and around the world."  (Ex. J at 2.)

[8] Lee testified that he recommended Zhang for full-time work because he "was under the assumption that as a Catholic, she did go to church and that she did pray."  (Ex. F at 170–71.)

6

insurance plans." (*Id.*) Other sections of the letter discuss her at-will employment ("either you or Jenzabar may terminate the relationship for any reason, with or without cause") and employee representations ("your acceptance of this offer, your employment by Jenzabar, and the performance of your duties will not violate or be a breach of any agreement"). The letter closes by stating: "Jing, we are very excited to have you join Jenzabar. If you wish to accept employment with the Company, please indicate so by signing both copies of this letter and both copies of the enclosed Agreement to Protect Company Assets."[9] (*Id.*) Zhang signed the June 10th Agreement on June 12, 2010. (*Id.*) Later in her employment, Zhang received a W-2 that listed her employer as "Jenzabar Incorporate," and an Annual New York Pay Notice from Jenzabar's HR department that identified Jenzabar as Zhang's employer. (Ex. 26 (Doc. No. 58–28); Ex. 28 (Doc. No. 58–30).) Jenzabar also classified Zhang's salary as a deduction on its tax return. (Ex. 29 (Doc. No. 58–31) at 117–18.) Chai encouraged Zhang to go to church more often after she started her employment (Ex. 3 (Doc. No. 58–3) at 239), and, at some point in 2010, Zhang was asked to attend AGA's daily prayer meetings. (Ex. 8 (Doc. No. 58–9) at 163–64.) Gleaned from the agendas emailed out by Brian Lee, prayer meetings generally started with an "opening prayer," and included, in some order: "devotionals and prayer requests"; departmental, organizational, and logistical updates; campaign discussions; and an "intercessory prayer." (*See generally* Ex. L (Doc. No. 66–12).)

AGA was incorporated on July 1, 2010 (Doc. No. 59 at ¶ 41.), and Zhang worked part-time under the terms of the June 10th Agreement over the next few months.[10] She managed four

---

[9] The Agreement to Protect Company Assets is explicitly a Jenzabar document, and it contains a multitude of references to Jenzabar ("In consideration of . . . my initial and continued employment with Jenzabar, Inc. . . ."), as well as a signature spot for Jenzabar's VP of Finance. (Ex. 19 (Doc. No. 58-21).) It contains no references to AGA. (*Id.*)

[10] Beginning on June 15, 2010, Zhang's organization, WRIC, received monetary grants from Jenzabar and the Foundation, though the method of these payments is disputed. (Doc. No. 68 at ¶79.) Zhang claims that Jenzabar

different programs in China, all of which provided various types of help and aid to women and children in China. These programs were: 1) a baby shower gift program, which consisted of providing a $20 monthly stipend to families in China who chose to keep their baby girls; 2) an orphan scholarship program; 3) attempting to reunite trafficked children with their birth families; and 4) assisting expecting mothers in China to escape forced abortions. (Doc. No. 68 at ¶¶ 68–71, citing Ex. E at 149; Ex. F at 80-81.) Zhang reported to Chai and Brian Lee, AGA's Executive Director, and received work assignments from both. (Doc. No. 68 at ¶74, citing Ex. E at 161.) On September 2, 2010, Lee sent an email to Chai recommending that Zhang be offered a full-time position with AGA.[11] (Ex. V (Doc. No. 66–22).) Zhang quit her part-time job at the *World Journal* and on September 7, received an agreement (the "September 7th Agreement") that contained substantially the same terms and conditions as the June 10th Agreement.[12] (Ex. W (Doc. No. 66–23).)

According to the defendants, AGA published its "Vision Framework" on or about November 19, 2010. (Doc. No. 68 at ¶ 93, citing Ex. X (Doc. No. 66–24).) Zhang disputes that the Vision Framework was ever published, distributed, or received by anyone, and claims to have never seen the entire document or heard about the Vision Framework. (*Id.*) The Vision Framework is an 88-page document that opens with an unaddressed letter from Chai containing, among other things, the following statement:

---

and the Foundation regularly made donations to WRIC. The defendants claim that Jenzabar and the Foundation provided donations to AGA, which were then sent to WRIC at Zhang's suggestion.

[11] This email is sent from brian@allgirlsallowed.org to Ling.Chai@jenzabar.net, and its subject line is "Zhang Jing & full-time with AGA." (Ex. V (Doc. No. 66–22).)

[12] The only notable differences between the September 7th Agreement and the June 10th Agreement are that Zhang's salary rose, commensurate with her new full-time status, she was now eligible to receive Jenzabar employment benefits, and the September 7th Agreement is printed on Jenzabar letterhead. (Ex. W (Doc. No. 66–23).) Zhang also received a Jenzabar employee handbook, setting forth Jenzabar's policies against employment discrimination, including on a religious basis. (Doc. No. 59 at ¶103-04, citing Ex. 6 (Doc. No. 58–7) and Ex. 24 (Doc. No. 58–26).)

> The following proposal is a detailed framework that reveals a glimpse of God's redemptive plan for China through the work of All Girls Allowed. In the short few months since our inception, as both new and experienced Christians in a new ministry, we have spent more time in prayer and scripture study than anything else. As a result, we have been blessed with miracle after miracle, one amazing encounter after another. God is faithful and his words are true. There is no doubt that this is a ministry that is after God's own heart, and God's heart and might is in this movement.

(Ex. X at AGA 155.)  After an introductory summary in the next section, which contains numerous references to religion in the final two paragraphs, the Vision Framework is organized into eleven sections.  Those sections are as follows:

- The One-Child Policy: Largest Crime Against Humanity in Our Time;
- The One Child Policy: Ticking Time Bomb;
- God's Response and Call: The Role of the Church
- Statistics and Facts About China
- The All Girls Allowed Team
- AGA Programs: EXPOSE
- AGA Programs: RESCUE
- AGA Impact: CELEBRATE
- Financial Model
- Summary
- Appendix: Statistics About China and One-Child Policy

(*Id.* at AGA 158.)  There are six programs described in the EXPOSE section: Documentary; Advocacy to Policymakers; Website & New Media; Traditional Media; Speaking Engagements and Church Outreach; and Volunteer Chapters.  (*Id.* at AGA 181–86.)  In the RESCUE section five more programs are described: Baby Shower Gift; Orphan Scholarships; Reuniting Trafficked Children; Legal Aid Against Forced Abortions; and Counseling for Mothers.  (*Id.* at AGA 187–92.)  The CELEBRATE section states that AGA draws inspiration from the British abolitionist movement, the Civil Rights movement, and the fall of the Berlin wall, and then mentions six principles "that inform our overall strategy and that we believe will enable us to celebrate the restoration of life, value and dignity to girls and mothers in China."  (*Id.* at AGA 195.)  Those principles are: The Gospel and the Chinese HC; Chinese Identity; Reasonable

Persuasion; Disproportionate Influence; Long-Term Impact; and Holistic Strategy.  (*Id.* at AGA

195–96.)

On April 30, 2011, the "Our Mission" section of the AGA website contained a similar

statement to that in its Information Packet[13] – that "through education, advocacy, strategic

partnerships, and legal defense, All Girls Allowed strives to:

> EXPOSE the truth about the One-Child Policy and mobilize the global
> community to advocate against the cruel methods used to enforce the One-
> Child Policy.
> RESCUE victims of the One-Child Policy through four programs:
> - Ending Gendercide – Educating families against female gendercide
>   and providing monthly stipends that ease the burden of having a
>   baby girl.
> - Educating Abandoned Girls – Providing scholarships for
>   abandoned girls to receive primary, secondary and post-secondary
>   education.
> - Rescuing Trafficked Children – Resourcing parents to find their
>   kidnapped children through an online search database and search
>   & rescue campaigns.
> - Defending Mothers – Providing legal defense to forced abortion
>   victims as well as mothers who are in danger of forced abortion or
>   forced sterilization
> CELEBRATE the work of God in bringing life, value and dignity to girls
> and mothers."

(Ex. KK (Doc. No. 61–1).)  The "Our Motivation" section of the website on April 30, 2011

contained two Bible phrases, and five paragraphs focusing on the religious motivation for All

Girls Allowed, and stating "our work is only possible through prayer!"  (*Id.*)  However, as late as

October 25, 2010, the "Our Mission" section of the website did not contain any mention of

religion other than a link for "Christian Baby Shower Gifts" at the bottom of the webpage.  (Ex.

16 (Doc. No. 58–18); Ex. 3 at 117–18.)  At that time, there was no "Our Motivation" section of

the website.

---

[13] Notably, the analogous statement in the Information Packet reads "through education, persuasion, prayer and legal
defense and by forming partnership with grassroots organizations in China and around the world, AGA seeks to end
the killings by. . . ." (Ex. J at 2.)

Zhang's religious practices began interfering with her employment almost immediately. In March of 2011, Zhang told Lee that she no longer wished to participate in the prayer meetings.  Lee relayed Zhang's complaint to Chai, and proposed meeting with Zhang twice a week to discuss spiritual issues.  (Ex. 30 (Doc. No. 58–32).) Zhang agreed to these meetings, but another conflict arose shortly thereafter, when Zhang was scheduled to testify before Congress on behalf of AGA in May 2011.[14]  In an email dated January 3, 2012, in response to questions that are unlisted, Zhang stated that "I feel honored to help women and children in the disadvantaged groups in China. God guides my way:" and later, after defending her work, explaining her goals, and thanking Chai and Lee for "giving me a relatively free space to develop my work," states that:

> the capability that God gives me is to fight for the right and interest of women and children, and provide a little information about God to those who are never aware of God as a byproduct.  If the two were to be performed at the same time, the loss would have been huge, as the atheist Chinese government would suppress the effort to fight for the right and interest of women and children at the same time while crashing the religion.  I believe that it would be more appropriate for a large number of clergy professionals and specially selected personnel to carry out a huge project to correctly spread God's messages in China.  Not everyone has the same capability.

(Ex. U (Doc. No. 66–21).) Zhang later objected to including a Bible verse in packages sent out as part of an AGA program, and told Lee she did not want to attend a team retreat in February of 2012.  This was the third of three team retreats held during Zhang's employment, and it was a two-day meeting at a church in Boston.  (Doc. No. 68 at ¶ 54, citing Ex. F at 241–42.)

Later that month, Lee and Chai had two meetings with Zhang about her employment. The subjects that were discussed at those meetings are disputed.  Zhang says that the only issues

---

[14] Zhang claims that Chai added religious references to her statement without her consent, while Chai argues that Lee and Zhang had agreed to include an introductory statement about religious aspects of AGA's work and then "reversed course."  At the hearing, Zhang did not read these portions of the testimony, but Lee (serving as her translator) said them in English.

discussed were Lee and Chai's concerns that Zhang was insufficiently religious, and that it was at these meetings that Chai and Lee first informed Zhang that they wanted to incorporate God into AGA's work.  The defendants state that these meetings were to discuss Zhang's job performance and her level of commitment to AGA (and claim those topics necessarily included a discussion of her religious practices).

      In March of 2012, Chai emailed the AGA Board to propose the "transition of a key staff member due to a major spiritual difference in our approach to the work of ending gendercide." (Ex. 32 (Doc. No. 58-34) at AGA 2825.)  After a telephone call with AGA's Board of Advisors, and consulting with Jenzabar's legal counsel, Chai and Lee presented Zhang with a document entitled "Proposal for Next Steps Between Zhang Jing (Director of Operations) and All Girls Allowed" on March 2, 2012.  (Ex. 33 (Doc. No. 58–35).)  The document set forth two scenarios, one in which Zhang would remain at the company, and one in which Zhang would seek other employment and initiate a transition from AGA.  To remain at the company, Zhang needed to, among other things, agree to a series of seven explicitly religious statements and "to seek the will of God in her life on a daily basis through study of God's Word and through prayer, along with regular weekly corporate worship."  If she did so, she would be granted a one-year evaluation period during which she could continue in her job, subject to monthly reviews.  Otherwise, Zhang would be given a "one-year period with mediation," during which she would continue to receive a full salary provided that she met certain conditions.  Zhang submitted a counter-proposal, in which AGA would agree to a one-year employment period where she would continue as Director of Operations if Zhang agreed to make All Girls Allowed "her primary work priority."

On March 9, 2012, Lee sent Zhang a letter indicating that AGA planned to close its New York office and replace her as Director of Operations.  The reasons stated for the termination were Zhang's unwillingness to move to Boston, the need for the Director of Operations to be fully committed to AGA (rather than spending time with a separate non-profit organization), and several performance issues.[15]  The letter also proposed that Zhang continue in her role until May 31, 2012, and assist in transitioning to the Boston office.  On March 28, 2012, Zhang's counsel sent a letter to the defendants claiming that her termination constituted religious discrimination. And on April 25, 2012, Chai informed Zhang that her employment with AGA would be terminated the following day.  Zhang alleges that the Foundation terminated its financial support of WRIC at the same time.  Defendants contend that the Foundation never provided financial support to WRIC, and any money transferred to WRIC was provided solely to conduct AGA's operations in New York and China.

## B.  Procedural History

Zhang and WRIC filed the Complaint on June 14, 2012, and filed an Amended Complaint on August 1, 2012.  The defendants filed their first answer on August 1, 2012, and then filed an Answer to the Amended Complaint on August 15, 2012, and an Amended Answer and Counterclaim on November 5, 2012.  After discovery proceeded over the next 11 months, both parties filed letters on October 11, 2013 requesting a pre-motion conference in advance of potential motions for summary judgment.  The pre-motion conference was held on January 10, 2014, and the summary judgment motions at issue were both filed on August 29, 2014.  Zhang moves for partial summary judgment on her claim of religious creed discrimination under the New York City Human Rights Law ("NYCHRL") against Jenzabar, AGA, and Chai.  The

---

[15] These issues were: "1) failure to participate in mandatory meetings, events, and activities; 2) lack of alignment with the vision, strategy, and goals of AGA; 3) lack of team attitude, acts of insubordination and failure to follow lawful directions of AGA; and 4) lack of professionalism."  (Ex. 36 (Doc. No. 58-38) at AGA 3526.)

defendants move for complete summary judgment, dismissing all claims asserted against them by WRIC and Zhang in the Amended Complaint.

### C. Summary Judgment Standard

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, affidavits, and documentary evidence demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003).  And in deciding whether a genuine issue of material fact exists, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

Once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citations omitted).  In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256.  Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be

tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247 – 48).

### D.  Employment Discrimination Under the NYCHRL

Section 8-107(1) of the NYCHRL protects individuals from discriminatory employment practices.  In relevant part, it deems it an "unlawful discriminatory practice for an employer . . . [to] discharge from employment" any person because of their religious creed, or "to discriminate against such person in compensation or in terms, conditions or privileges of employment."  N.Y. City Admin. Code § 8-107(1)(a).  Section 8-107(3) provides that it is unlawful for an employer to "impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to violate, or forego a practice of, his or her creed or religion."  N.Y. City Admin. Code § 8-107(3)(a).

This language is analogous to that found in federal and state anti-discrimination laws, but the Local Civil Rights Restoration Act of 2005 (the "Restoration Act") established that the NYCHRL must be analyzed "independently from and more liberally than" those parallel statutes. *Loeffler v. Staten Island University Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citing *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 66–69, 872 N.Y.S.2d 27, 31 (1st Dep't 2009).  *Loeffler* went on to explain, "[t]here is now a one-way ratchet," meaning that federal and state human rights laws must be interpreted "as a *floor* below which the City's Human Rights law cannot fall."  *Id.*  As a result, the NYCHRL must be broadly construed "in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

### E.  Exemption for Religious Organizations

15

Section 107(12) of the NYCHRL provides an exemption from liability for religious organizations.  It states that nothing in the law bars "any religious or denominational institution or organization or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization from limiting employment . . . or giving preference to persons of the same religion or denomination" in order to promote "the religious principles for which it is established or maintained."  N.Y. City Admin. Code § 8-107(12).

Defendants claim the benefit of this exemption, and assert that AGA, as a religious organization, cannot be liable for religious discrimination for firing Zhang, even for reasons related to her faith.[16]  Both parties agree that for the exemption to apply here, AGA must, *itself*, be a "religious organization" under the statute. (*See* Doc. No. 60 at 22 n.3.) [17]

The NYCHRL does not define "religious organization."  In the face of a dearth of case law interpreting this provision of the NYCHRL, the parties urge the Court to look to interpretations of the comparable federal and state employment discrimination statutes (Title VII and the NY State Human Rights Law § 296(11), respectively), and the cases interpreting them, to guide its analysis of the religious exemption under the NYCHRL.  Many courts have so done,

---

[16] It appears that defendants concede that Zhang was fired for these reasons.

[17] Zhang argues that any defense relying on this exemption has been waived because it was not raised in the Answer. However, it is well-established that this Court can consider an affirmative defense raised for the first time at the summary judgment stage, as long as the plaintiffs had an adequate opportunity to respond.  *See, e.g.*, *Astor Holdings, Inc. v. Roski*, 325 F. Supp. 2d 251, 260–61 (S.D.N.Y. 2003) (citing *Curry v. City of Syracuse*, 316 F.3d 324, 330–31 (2d Cir. 2003).  Further, this Court can construe the defendants' motion for summary judgment as a request to amend the Answer if the plaintiffs had a chance to respond and otherwise suffered no prejudice as a result of the late pleading.  *See Ebert*, 2014 WL 349640, at *9 (citing *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000)).  Here, though the defendants mistakenly raised the analogous state affirmative defense in their Amended Answer rather than the affirmative defense in the City Code, doing so provided ample notice to the plaintiffs of the defendants' intention to defend on this basis, and gave the plaintiffs more than an adequate opportunity to respond.  Moreover, numerous document requests submitted by the plaintiffs in discovery appear directed specifically at this issue, which this Court takes as further evidence that the plaintiffs would suffer no prejudice if the defendants are allowed to assert this defense.  Accordingly, the Court rejects plaintiff's claim of waiver.

and this Court will as well.  But the task is not so clear cut for many reasons.  For example, while the city, state, and federal statutes barring religious discrimination all contain exemptions for religious organizations, those statutes are all structured differently, and their scope and focus have been construed differently.[18]  Indeed, various federal Courts of Appeals construing the *same* statue – Title VII – do not even agree on the proper test to apply to decide what constitutes a religious organization, and even judges on the same court and in the same case differ as well.[19] The Second Circuit has yet to weigh in on the construction of any of these statutes.

---

[18] For example, the religious exemption in the NYSHRL is similar  to Section 8-107(12).  Both exempt religious organizations from religious creed employment discrimination liability.  *See Scheiber v. St. John's Univ.*, 84 N.Y.2d 120, 126 (N.Y. 1994) (quoting N.Y. Exec. Law § 296(11)).  But the NYSHRL exemption protects organizations from limiting employment or "making such selection as is calculated . . . to promote the religious principles for which it is established or maintained," while the NYCHRL exemption protects organizations from limiting employment or "taking such action as is calculated" to do the same.  *Compare* § 296(11) *with* § 8-107(12).  The analogous federal exemption in Title VII, on the other hand, is constructed differently.  It provides that the anti-discrimination statute simply does not apply to a religious organization "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such [organization] . . . of its activities."  42 U.S.C. § 2000e-1(a); *see Lown v. Salvation Army, Inc.*, 393 F. Supp. 2d 223, 254 (S.D.N.Y. 2005) (noting that the language in the state and city exemptions is more circumscribed than their federal counterpart).

[19] In *E.E.O.C. v. Townley Engineering & Manufacturing Company*, the Ninth Circuit held that a corporation was only entitled to avail itself of the Title VII exemption if its "purpose and character are primarily religious."  859 F.2d 610, 618 (9th Cir. 1988).  To make this determination, a court must weigh "all significant religious and secular characteristics."  *Id.*  Moreover, after reviewing the legislative history of the religious corporation exemption, the *Townley* court found that, in passing the law, "all assumed that only those institutions with extremely close ties to organized religions would be covered.  Churches, and entities similar to churches, were the paradigm."  *Id.*  This same "primarily religious" test was reaffirmed and used five years later in *E.E.O.C. v. Kamehameha Schools/Bishop Estate*, 990 F.2d 458 (9th Cir. 1993).  While the Third Circuit agreed that all significant religious and secular characteristics would be weighed, it enumerated a list of nine factors that helped it assess whether an organization was religious or secular.  *See LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007).  Three years later, in *Spencer v. World Vision, Inc.*, the Ninth Circuit held that "an entity is eligible for the section 2000e–1 exemption, at least, if it is organized for a religious purpose, is engaged primarily in carrying out that religious purpose, holds itself out to the public as an entity for carrying out that religious purpose, and does not engage primarily or substantially in the exchange of goods or services for money beyond nominal amounts."  633 F.3d 723, 724 (9th Cir. 2010).  But even there, the panel disagreed as to the proper test to apply, as all three judges articulated different tests they would apply to determine whether an organization is religious.  Judge O'Scannlain believed that an organization should qualify for the Title VII exemption if it was organized for a self-identified religious purpose, was engaged in activity consistent with and in furtherance of those purposes, and held itself out to the public as religious.  *See Spencer*, 633 F.3d at 734.  Judge Kleinfeld believed that in addition to meeting those qualifications, an organization had to refrain from engaging "primarily or substantially in the exchange of goods or services for money beyond nominal amounts."  *Id.* at 748.  And, in dissent, Judge Berzon argued that the only consideration should be whether the primary activity of a purportedly religious organization consists of voluntary gathering for prayer and religious learning.  *Id.* at 763.

There is, however, a common denominator across all of the cases construing all of the statutes with regard to the determination of whether an entity constitutes a religious organization: the inquiry is a mixed question of law and fact.  Thus, regardless of the legal yardstick used to measure the particular entity at issue, all courts engage in a robust analysis of the facts that arguably demonstrate the religious character of the organization and its work.

Here, the Court need not and does not adopt or endorse a particular test or measure to define a religious organization under the NYCHRL – or any of its analogues; at this juncture, resolution of this legal standard is premature.  That is because, regardless of the legal test employed, the Court cannot determine on the factual record before it whether AGA qualifies as a religious organization under the NYCHRL.  As such, the Court denies the parties' cross-motions for summary judgment on plaintiff's religious discrimination claim.

## F.  The Parties Cross-Motions for Summary Judgment Cannot be Decided on this Record

There are a number of factual issues that preclude summary judgment for either side. They include, but are not limited to disputes of fact, a paucity of relevant details in critical areas, and issues of credibility.  Among them are the following.

The depositions of Lee, Chai, and Zhang paint markedly different pictures of the founding of the organization.  For example, Chai testified that she conveyed AGA's religious purpose to Zhang in an initial conversation before AGA's launch, explaining that it would be a religious organization that relied on the power of God to defeat gendercide and the One-Child policy.  (Ex. E at 139–40.)  Zhang testified that this conversation never happened.  (Ex. B (Doc. No. 71–2) at 131, 201–02, 237.)  Of course, given the sharp disputes in testimony on material

facts, credibility is a key issue that cannot be resolved on the cold record of summary judgment.[20]

As another example, the parties dispute whether key documents purporting to represent the religious nature of AGA were ever disseminated.  They include what the parties refer to as the Information Packet contains multiple overt religious references, including that "AGA is motivated by a desire to . . . transform lives through God's love and amazing grace," and that AGA seeks to end infanticide "through education, persuasion, prayer and legal defense."  (Ex. J at 2.)  Zhang disputes that the Information Packet was ever actually published, much less distributed at AGA's launch in June of 2010.  There is a similar dispute regarding the Vision Framework, another explicitly religious document that purports to "reveal[] a glimpse of God's redemptive plan for China through the work of All Girls Allowed."  (Ex. X at AGA 155.)  The defendants claim that the Vision Framework was published on or about November 19, 2010, while Zhang contends that the Vision Framework was never published, distributed, or received by anyone.

These disputes are particularly relevant in light of the fact that Zhang herself describes the public presentation of AGA as "inconsistent"  (*see* Pl. Mem. in Opp. (Doc. No. 72) at 22.), and a view of the record evidence could reasonably suggest that AGA's religious nature evolved from its inception.  For example, it is undisputed that neither AGA's Articles of Organization nor its Bylaws contain any mention of a religious purpose, and the former explains that AGA "is organized and shall be operated exclusively for charitable, educational, literary or scientific purposes."  (Ex. 12 (Doc. No. 58–13).)  Similarly, as of October 25, 2010, AGA's website

---

[20] The Court also notes that Zhang testified through a translator who seemed to have difficulty at times precisely translating the witness's testimony.  Though that is understandable given the complexities of the Chinese language and its dialects, this further exacerbates the difficulty in assessing the record evidence.

contained no explicit mention of religion, and the only religious reference was a hyperlink to "Christian Baby Shower Gifts." (*See* Ex. 16 (Doc. No. 58–18); Ex. 3 at 117–18.)  But by April 30, 2011, the "Our Mission" section of the website stated that AGA worked to celebrate "the work of God in bringing life, value and dignity to girls and mothers," and the "Our Motivation" section of the website contained two Bible phrases and five paragraphs focusing on the religious motivation for All Girls Allowed, and stating "our work is only possible through prayer!"  (Ex. KK.)

Likewise, AGA's application for 501(c)(3) status in April of 2011 also neglects to mention any religious goal, motivation, or purpose.  (Ex. 10 (Doc. No. 58–11) at AGA 45–46.)  However, its application for 501(c)(3) status in April of 2012 unequivocally and robustly identifies Chai's religious purpose in starting AGA, explaining that "All Girls Allowed was founded with the mission of following Jesus' teachings about restoring life, value and dignity to girls and mothers," and that AGA's programs are consistent with AGA's "spiritual purpose based on the teachings and actions of Jesus Christ."  (Ex. Z (Doc. No. 66–26) at AGA 93.)  As plaintiff notes, this supplemental IRS application was filed on April 23, 2012, weeks after Zhang's attorney notified AGA, the Foundation, and Jenzabar that Zhang had been subject to religious discrimination.  (*See* Ex. 37 (Doc. No. 58–39) (dated March 28, 2012).)  However, whether this renewed application was based on a desire to more clearly articulate the actual religious mission and purpose of AGA or was entirely self-serving in response to the threat of potential litigation raises questions of credibility that this Court cannot resolve at this stage.

Taken as a whole, a reasonable view of this evidence suggests that, at least by the time that Zhang was fired, AGA might have qualified for the exemption as a religious organization under the NYCHRL.  Nothing prohibits an entity from evolving in such a way as to affect its

20

status as a religious organization. Organizations can lose the benefit of the religious exemption; there is no reason why organizations cannot gain its protection. *Cf. Pime v. Loyola University*, 803 F.2d 351, 357 (7th Cir. 1986) (Posner, J. concurring) (discussing the changes in religious affiliation of Loyola University since its founding in 1870 and their impact on the religious-employer defense). But on this record, the Court cannot weigh the significance of these changes, not only because it is prohibited from doing so on summary judgment, but because the deposition testimony is severely limited in key areas about which the parties provide little, if any, detail.

For example, there is very little in the deposition testimony to flesh out such things as the day-to-day operations of the organization, the nature and scope of its various programs, and how those programs were implemented on a practical level.[21] Indeed, while there are many references to daily prayer meetings, retreats and other spiritual events, there is little, if any, discussion in the record as to what actually took place at these gatherings, including how, if at all, these religious components were intertwined with AGA's programs, day-to-day operations and/or mission, particularly in light of the fact that Lee's e-mails state, in conclusory fashion, that they were.[22] (*See generally* Ex. F at 241–42; Ex. L.) Nor does the record contain facts from

---

[21] Not only is there a paucity of evidence relating to the operations of AGA, so too is there little to describe its affiliated entities, Jenzabar, and the Jenzabar Foundation. Little is known about Jenazabar; while the evidence recounts that is a software company, Chai and her husband are its principals, and it has offices in Boston, there is no detail concerning its day-to-day operations, its funding, and, most important, its relationship, both financial and otherwise, with both the Jenzabar Foundation and AGA. These facts, among others, are critical to addressing another issue raised on summary judgment: that is, whether Jenzabar is Zhang's direct, joint or single employer and therefore liable for religious discrimination, an issue that the parties fiercely dispute. On this record, without more facts concerning the day-to-day working relationship between these entities, the Court cannot resolve this issue. However, it appears that defendants do not dispute that at the very least, AGA qualifies as Zhang's employer. (*See* Pl. Mem. in Supp. (Doc. No. 57) at 12; Am. Answer (Doc. No. 21) at ¶ 5.)

[22] Zhang also claims that she was continually harassed because of the nature and depth of her religious practices, and that she was subjected to "anti-Catholic" comments such that, even if AGA is entiled to the religious exemption, its conduct fell outside the bounds of its protections. *See Logan v. Salvation Army*, 110 Misc. 3d 756, 757, 809 N.Y.S.2d 846, 847 (Sup. Ct. 2005) (under the NYSHRL, "those limited exemptions for religious organizations are a far cry from letting them harass their employees and treat the employees in an odiously discriminatory manner during their employment, and to use derogatory expressions toward the employees.") However, the record evidence does not detail whether Zhang was forced to attend the prayer meetings or simply encouraged to do so. Moreover, the only comments cited by Zhang are that "many Catholics are attacked by evils and become worse" and

21

which one could glean simply how many employees worked for AGA, whether some, all or none

were co-religionists (other than Zhang's testimony regarding Yan Xu and Li Qun Cheng (Ex. B

at 287-88), or what they might have to say about AGA's work and purpose, religious or

otherwise.  Simply put, the record as a whole paints such a sparse picture of AGA's activities as

to make it quite difficult to understand its work, structure, and  purpose in general, let alone

whether the organization as a whole is imbued with religious character.

There is one final example of record evidence for which there is no explanation, that

could certainly bear on the issue of AGA's status as a religious organization:  that is, whether

AGA has opted to mask its religious character while conducting AGA operations in China.  In a

phone conversation with Lee and Chai, Zhang herself explains that AGA operates in a "gray

area" in China, noting that if

> …we continue to preach . . . probably our whole program will be wiped out.  You all
> know the fact that so many people, underground churches, family churches, contacts are
> jailed, dissolved, or persecuted by the government. … After investigation and work step
> by step, two of our four outlets of Babyshare [unintelligible] are now under the charge of
> our Christian friends.  The fifth one is now entirely under the charge of a family church
> and their several priests.  Another one is underway.  I plan to organize the old and
> scattered Christians who don't have priests in the countryside.  … In my belief, it's not
> wrong to preach the gospel of God.  But we can have different ways or methods. …

(Ex. 34 (Doc. No. 58–36) at 3–4.)  And in an email to Lee and Chai, Zhang refers to a need to

separate religion and AGA's work, worrying that otherwise, "the atheist Chinese government

would suppress the effort to fight for the right and interest of women and children at the same

time while crashing the religion."  (Ex. U at AGA 10955.)  These passages suggest two wholly-

different strategies regarding how to carry out AGA's programs in a country governed by a

religiously repressive regime (one that imprisoned Zhang for her prior political activities):  either

---

Catholicism has had "problems" and "scandals." (Ex. 34 at 5–6.)  Thus, on this record, the Court cannot determine
whether any alleged harassing conduct falls outside the scope of the NYCHRL's religious exemption.

hide AGA's true religious character, or separate its religious motivation and conduct its charitable activities in a secular manner. The former suggests that AGA is, indeed, a religious organization; the latter suggests it is not. The record evidence does not resolve this key concern.

Given the material disputes of fact, issues of credibility, and the paucity of details about crucial aspects of AGA, summary judgment on the question of whether AGA constituted a religious organization under the NYCHRL does not lie. In contrast, there are a handful of issues raised by the parties that can be decided as a matter of law. The Court addresses them below.

### G. Chai's Liability as Zhang's Employer

Under the NYCHRL, an individual is liable as an employer if that person has "an ownership interest in the relevant organization or the power to do more than carry out personnel decisions made by others." *Burhans v. Lopez*, No. 13-CV-3870 (AT), 2014 WL 2583739, at *8 (S.D.N.Y. June 10, 2014) (citing *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012)) (internal citations and quotations omitted). Here, Chai does not dispute that she has an ownership interest in Jenzabar, or that, as founder and president of Jenzabar and AGA, she had the power to hire, fire, and do more than just carry out the personnel decisions of others. Therefore, Chai is liable as an employer under the NYCHRL to the extent that AGA and/or Jenzabar is liable for religious discrimination. *See id.*

### H. WRIC's Associational Claims for Discrimination

The defendants move to dismiss WRIC's claim of discrimination under section 8-107(20) of the NYCHRL.[23] Simply put, this provision extends the NYCHRL to protect those that suffer an injury because of their association with a person who is subjected to unlawful discriminatory

---

[23] Section 8-107(20) provides that "the provisions of this section set forth as unlawful discriminatory practices shall be construed to prohibit such discrimination against a person because of the actual or perceived race, creed, color, national origin, disability, age, sexual orientation or alienage or citizenship status of a person with whom such person has a known relationship or association." § 8-107(20).

practices.  *See Bartman v. Shenker*, 786 N.Y.S.2d 696, 700 (N.Y. Co. Sup. Ct. 2004).  Here, the

defendants argue that WRIC must show that it suffered an injury related to the terms, conditions,

or privileges of employment, and because WRIC was not an employee of any of the defendants,

its claim of associational discrimination must be dismissed.  But this argument fails upon any

examination of the relevant provision, much less the "liberal" construction this Court is required

to use in light of the NYCHRL's "uniquely broad and remedial purposes."  *Loeffler*, 582 F.3d at

278 (citing *Williams* 872 N.Y.S.2d at 31).  WRIC does not have to prove that its injury must be

related to the terms, conditions, or privileges of *its own* employment – indeed, the explicit words

of section 8-107(20) cover parties that are discriminated against as a result of their "relationship

or association" with a party that suffers such an injury.  The defendants' reading of the provision,

and their attempt to rewrite it, is therefore misguided.  To maintain a claim for association

discrimination, WRIC must simply allege that it suffered an independent injury because of its

relationship with Zhang, who alleges unlawful discriminatory practices related to her terms,

conditions, or privileges of employment.

    *Bartman* addressed an analogous situation, where an organization (ART) asserted that it

was injured as a result of its association with the plaintiff alleging discrimination by the

defendants.  There, the court found that ART had standing to file suit under section 8-107(20) of

the NYCHRL, as ART sufficiently alleged that it suffered an independent injury causally related

to the defendant's unlawful discrimination against Bartman, ART's executive director.[24]  The

reasoning in *Loeffler* supports this thinking as well – there, the Second Circuit stated that a non-

---

[24] The defendants attempt to distinguish *Bartman* by arguing that ART alleged a denial of the defendant's place of
public accommodation, rather than an injury related to the terms, conditions, or privileges of its employment.
However, as the defendants acknowledge, employment is one of the categories of unlawful discriminatory practices
prohibited by the NYCHRL.  Requiring any plaintiff asserting an associational discrimination claim in an
employment context to have, itself, been the employee of the defendant would defeat the explicit purpose of § 8-
107(20).

disabled party need only prove that it suffered an independent injury causally related to the discrimination alleged by someone with whom they are associated.[25]  *See Loeffler*, 582 F.3d at 279-80.  Here, WRIC is alleging that it lost financial support as a result of the defendants' unlawful discriminatory practices against Zhang, which are alleged to have directly affected the terms and conditions of her employment.  That is sufficient to maintain a claim for associational discrimination under section 8-107(20).

This Court also denies the defendants' motion for summary judgment dismissing WRIC's retaliation claim.  WRIC alleges that it suffered an injury as a consequence of the defendants' unlawful retaliatory conduct.  (Am. Compl. ¶¶ 85, 104.)  "The essence of discriminatory retaliation is its capacity to quell the individual's willingness to defend himself against discrimination.  Plainly, this may be accomplished through direct retaliation against an individual, or retaliation against persons associated with that individual."  *Bartman*, 786 N.Y.S.2d at 700.  Contrary to the defendants' argument, the NYCHRL *does* provide for "associational retaliation" claims, and the claim here can survive summary judgment.

As the defendants point to no facts adduced through discovery that resolve any material disputed issues, summary judgment cannot be granted on these claims.  A reasonable jury could find that the defendants stopped their funding and support of WRIC because of Zhang's religious practices, and that the loss of this funding was an independent injury suffered by WRIC as a result of the discrimination against Zhang in violation of section 8-107(20), and in retaliation for Zhang's counsel notifying the defendants that they had violated anti-discrimination laws in

---

[25] The defendants argue that *Loeffler* is unhelpful because it addresses the scope of the Rehabilitation Act, not the NYCHRL.  But while the associational discrimination claim there was addressed in the context of the Rehabilitation Act, the analysis behind it is equally instructive here.  In addition, this Court is mindful of the Second Circuit's instruction to give the NYCHRL "an independent, liberal construction," and to treat similarly-worded provisions of state or federal law "as a floor below which the City's Human Rights law cannot fall."  *Loeffler*, 582 F.3d at 278 (citing *Williams* 872 N.Y.S.2d at 31) (internal quotations omitted).

violation of section 8-107(7).  The defendants' request for summary judgment on these claims is denied.

### I.   Aiding and Abetting by the Jenzabar Foundation

The defendants also move for summary judgment dismissing Zhang's claims against the Foundation.  They argue that the Foundation was not her employer – it did not pay her, exercise any control over her work activities, or exert any influence over the decisions to hire or fire her. However, the plaintiffs do not contend that the Foundation was Zhang's employer – rather, they argue that it is liable under section 8-107(6) for aiding and abetting Jenzabar, AGA, and Chai in discriminating against WRIC on the basis of its association with Zhang, and in retaliating against Zhang because of her protected activity.  Section 8-107(6) supports claims for aiding and abetting, and if Jenzabar, AGA, and Chai are found liable for discriminating and retaliating against WRIC and Zhang, a reasonable jury could find that the Foundation aided and abetted these violations of the NYCHRL.  *See, e.g.*, *Malena v. Victoria's Secret, LLC*, 886 F. Supp. 2d 349, 367 (S.D.N.Y. 2012).  Specifically, the plaintiffs contend that the Foundation aided the unlawful discriminatory acts of Jenzabar, AGA, and Chai by withdrawing promised funding from WRIC in retaliation for Zhang asserting a religious discrimination complaint.  These are facts sufficient to suggest that the Foundation was involved in the alleged discriminatory scheme, and therefore are enough to survive a motion for summary judgment.  *See Tate v. Rocketball, Ltd.*, No. 14-CV-2056 (JBW), 2014 WL 4651969 (E.D.N.Y. Sept. 18, 2014).  The defendants do not respond to this evidence.  As a result, their motion for summary judgment dismissing all claims against the Foundation is denied.

**CONCLUSION**

For the reasons set forth above, the Court denies summary judgment on the parties' cross-motions related to the claims of both Zhang and WRIC for religious discrimination  and retaliation against AGA, Jenzabar,  the Jenzabar Foundation and Chai.

The parties are Ordered to meet and confer, and advise the Court by letter, within three weeks of the date of the Memorandum and Order, as to next steps to move this case forward.


SO ORDERED.

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge

Dated: Brooklyn, New York
       March 30, 2015